Filed 10/23/25  P. v. Molano CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DANIEL ANTHONY MOLANO,<br><br>    Defendant and Appellant. | F087991<br><br>(Super. Ct. No. F22907286)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Francine Zepeda, Judge.

Moran Law Firm, Amanda K. Moran and S. Eric Bishop II for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Kari L. Muller, Ian Whitney and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Defendant and appellant Daniel Anthony Molano was charged in connection with three separate incidents of physical violence against three women, two of whom were in romantic relationships with him. The jury convicted defendant and found the sentence enhancement allegations true as follows: infliction of corporal injury against A.B. with personal infliction of great bodily injury (GBI) (Pen. Code, §§ 273.5, 12022.7, subd. (e); count 1),[1] assault with a deadly weapon against A.B. (§ 245, subd. (a)(1); count 2), criminal threats against A.B. (§ 422; count 3),[2] felony vandalism of A.B.'s vehicle (§ 594, subd. (a); count 4), battery with serious bodily injury against B.R. with personal infliction of GBI (§§ 243, subd. (d), 969f; count 5), assault by means likely to produce GBI against B.R. with two GBI enhancements (§§ 245, subd. (a)(4), 12022.7, subds. (a), (e); count 6), and infliction of corporal injury against E.M. with personal infliction of GBI (§§ 273.5, 12022.7, subd. (e); count 7).

In a bifurcated proceeding, defendant admitted he had two prior domestic violence convictions, one of which was a serious felony for purposes of Three Strikes sentencing and imposition of a prior felony conviction enhancement. (§§ 273.5, subd. (f)(1), 667, subds. (a)(1), (b)–(i), 1170.12, subds. (a)–(d).) Defendant also admitted the following four factors in aggravation: "The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness"; "The defendant has engaged in violent conduct that indicates a serious danger to society"; "The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness"; and

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Section 422 was amended, effective January 1, 2026, but that statutory change, which addresses threats against officials, politicians, judges, and commissioners, is not relevant in this case. (Assem. Bill No. 352 (2025–2026 Reg. Sess.).)

"The defendant has served a prior term in prison or county jail under section 1170[, subdivision ](h)." (Cal. Rules of Court, rule 4.421(a)(1), (b)(1)–(3).)

The trial court sentenced defendant to an aggregate determinate term of 30 years in prison. The court selected count 1, domestic violence against A.B., as the principal term and imposed the upper term of five years, doubled to 10 years under the Three Strikes law, with an additional four years for the GBI enhancement and five years for the prior felony enhancement. (§ 1170.1, subd. (a).) The court imposed the following subordinate terms: two years for assault in count 2, one year four months for criminal threats in count 3, two years for assault with one year four months for the GBI enhancement in count 6, and two years eight months for domestic violence with one year eight months for the GBI enhancement in count 7. (*Ibid.*) On count 5, the court imposed the upper term of four years, doubled to eight, and stayed (§ 654), and on count 6, having imposed the GBI enhancement under section 12022.7, subdivision (e), the court stayed the GBI enhancement under section 12022.7, subdivision (a) (§§ 1170.1, subd. (g); 12022.7, subd. (h)). On count 4, vandalism, the court reduced the felony to a misdemeanor and imposed a concurrent one-year term. (§ 17.)[3]

Defendant timely appealed and advances the following claims of reversible error. First, E.M. did not testify at trial and defendant challenges the admission of her statements to a police officer, a paramedic, a nurse, and a doctor. He claims the trial court erred in finding E.M. unavailable as a witness (Evid. Code, § 240), and in admitting the statements as explanations of the infliction of physical injury and as spontaneous statements (*id.*, §§ 1370, 1240); and he claims the statements to the police officer and nurse were testimonial hearsay admitted in violation of the confrontation clause of the Sixth Amendment (*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*)). Defendant

---

[3]    Section 17 was amended, effective January 1, 2026, but the amendment is not relevant in this case. (Assem. Bill No. 321 (2025–2026 Reg. Sess.).)

also claims the jury's findings that he personally inflicted GBI on A.B. and B.R. are unsupported by substantial evidence of GBI, and he claims he was coerced into waiving his constitutional right to testify.

Prior to the sentencing hearing, defendant retained new counsel, and he claims numerous instances of ineffective assistance of counsel (IAC) by former counsel.[4]  He also claims that cumulatively, the errors complained of were prejudicial.  Finally, he advances the following claims of sentencing error:  the trial court abused its discretion when it denied his request to dismiss the sentence enhancements under section 1385 without analyzing whether dismissal would endanger public safety or providing an explanation, there is no evidence that dismissal of the enhancements would endanger public safety, and the court erred in imposing one-third of the aggravated term for the GBI enhancement attached to count 7 rather than one-third of the middle term, entitling him to a reduction in his sentence.

The People dispute any entitlement to relief.

For the reasons set forth herein, we find no reversible errors and affirm the judgment.

## FACTUAL SUMMARY

**I.      Prosecution Evidence**

      **A.      2019 Crime Against E.M.**

            **1.      S.O.'s Testimony**

In April 2019, E.M. was married to and living with defendant and their two young children.  Sometime between 12:00 and 12:30 a.m. on April 5, 2019, E.M. called her father, S.O., and asked him to pick her up.  She sounded scared.  After S.O. got off work at 12:30 a.m., he drove to E.M.'s house, where she and the two children were waiting

---

[4]      Given that defendant raises claims of trial error and sentencing error, we shall refer to former counsel by that description for clarity.

outside. He did not see any injuries on E.M. S.O. took them to his house, and when he woke up the next morning, they were gone.

E.M. called S.O. around 8:00 or 8:30 that morning. It sounded like she was running, and she wanted him to pick her up. She told him to hurry, and he said he would come as soon as he dropped his other children off at school. After taking his children to school, S.O. drove to a restaurant a few minutes from E.M.'s house, where she was waiting for him. She was inside with her two children, who were crying. E.M. had a bloody towel draped over her head. As he approached her, he saw she had been beaten "like if she was in a boxing match. Both her eyes were closed. She was just bloody." S.O. assumed defendant was responsible, but E.M. never told him what happened.

S.O. called his mother to come and pick up the children, and when she arrived, he carried them to her van. He and his mother then helped E.M. to the van because she could not see where she was going. Her eyes were puffy and closed, she kept complaining her stomach hurt, and she curled up in a fetal position in the front passenger seat of the van. At his mother's insistence, S.O. accompanied them in the van to his uncle's shop just down the road to call 911. Police responded to the shop and E.M. was eventually transported to the hospital by ambulance.

### 2. Detective's Testimony

Detective Baroni was dispatched to the scene of a domestic violence call around 10:45 a.m. and he arrived prior to the paramedics. He observed E.M. was "severely injured" and had a hand towel covering her head. She was in the passenger seat of a van and spoke very softly. She was reluctant to talk or answer very many questions. Baroni testified that throughout their interaction, E.M. remained afraid and visibly upset, she said her whole body hurt, and her eyes were swollen shut.

The jury viewed portions of Baroni's body camera footage. Baroni testified he was familiar with defendant, who was a junior, and his father, who was a senior. In the first excerpt, S.O. said his daughter's husband "beat her really badly" and "both of her

5.

eyes are closed." Baroni asked E.M. to take off "the thing" on her head and asked, "Now are we talking about Daniel Molano Jr. or Daniel Molano Sr.?" E.M. responded, "Junior."

In the second excerpt, Baroni asked if he had permission to go inside E.M.'s house and look for "him." E.M. responded, "I just don't want to make everything worse." In the third excerpt, a paramedic was assessing E.M. and noted severe swelling and possible inner ear damage. The paramedic asked her if she was dizzy and she said, "I[] almost threw up right there." In the fourth and final excerpt, Baroni asked for "his" phone number for her sake and the sake of the kids. She responded, "I'm too scared [¶] … [¶] … it'll be worse."

Police went to E.M.'s residence, observed a vehicle there, and subsequently stopped that vehicle approximately one to one and one-half miles from the residence. Baroni drove to the location of the stop and had contact with defendant, who appeared shocked. Defendant was transported to headquarters, and Baroni saw what appeared to be dried blood on the bottom and side of his shoe.

### 3. Paramedic's Testimony

An ambulance arrived on scene around 11:00 a.m. One of the paramedics, Travis McSherry, testified that E.M.'s eyes were bulging and swollen shut with limited vision in her left eye and no vision in her right eye. She had multiple bruises on her face and missing and broken teeth, and she complained her jaw was not closing properly and of rib pain. Having responded to tens of thousands of calls during his career, very few calls stood out, but he had a vague independent recollection of E.M.'s face because its condition stood out.

E.M. was very tearful and scared of being injured further or worse if she reported what happened or sought medical care, so the ambulance was on scene for 20 minutes before they could convince E.M. to go to the hospital. Her injuries did not appear to be life threatening, but she needed immediate care because of the potential loss of her right

6.

eye, which was bulging. While E.M. was being evaluated at the scene, she reported her boyfriend punched and kicked her in the face and ribs around 3:30 a.m., and she later walked to a business to get help. She did not volunteer his name and McSherry did not ask.

The ambulance arrived at the hospital around 11:30 a.m. During the time the ambulance crew was obtaining her vital signs and she was being registered, E.M. vomited 100 milliliters of blood. McSherry testified that this volume was not considered a lot for vomit, but was for blood.

### 4. Nurse's Testimony

After E.M. arrived at the hospital, she was taken to the trauma bay for moderate to severe injuries. The registered nurse who attended to E.M., Lea Pisching, testified E.M.'s right eye was swollen shut and she could not open her left eye, but it could be opened manually. E.M. had bruises on her body and was missing a tooth. She was quiet and withdrawn, she was tearful at times, and she appeared afraid.

Within the first 30 minutes of arrival, approximately, E.M. stated that her husband assaulted her with his feet and hands, and she provided defendant's name. E.M. was hesitant to say what happened because it had happened before, and she expressed worry it would happen again and her children would be hurt. Police were not present at that time, but because hospital personnel were mandated reporters, police had been contacted and an officer arrived later that afternoon.

E.M. had X-rays and a CT scan and, while Pisching was present, E.M. was seen by an oral maxillofacial surgeon and an ophthalmologist. E.M. had "[a] right orbital floor blowout fracture," meaning all the bones around her eye were fractured.

### 5. Physician's Testimony

Dr. Spano, who saw E.M. after she arrived at the hospital, testified that E.M. reported she had been punched and kicked in the head and face by her significant other. She also complained of pain in her torso and eyes, said her hair was pulled, and she had a

headache, was kicked in the ribs, and was scratched on her arms and chest. E.M.'s most concerning injury was her right eye and medical staff needed to exclude the possibility of a globe, or eyeball, rupture. E.M. had a bedside ultrasound of her eye and stomach, and she had a CT scan of her face and head. She had a fracture to the medial wall and floor of her orbit, which Spano testified was a significant injury. E.M. was hospitalized for two days, but did not have surgery during that time period.

### 6. Surgeon's Testimony

Dr. Zakhary, an oral maxillofacial surgeon, testified that E.M. had an orbital floor fracture with typical presentation: swelling and a bloodshot, sunken eye. She also had double vision due to impaired eye movement. A week after she was injured, E.M. underwent surgery, which involved reconstruction of the orbital floor with a titanium plate to support the eye and move it back into its normal position. Without surgery, the eye would have been permanently sunken in, and the double vision would have been potentially permanent.

### 7. Physical Evidence

At E.M.'s house, there were apparent bloodstains outside the house on an exterior wall, patio, step, and grass and inside the house on the kitchen floor, the interior and exterior knob of the rear door, the interior of the door, the bathroom floor and the exterior knob of the bathroom door. There was also clothing in a bedroom that appeared to have bloodstains, including a pair of still-damp shorts soaked with what appeared to be urine.

The following items had blood-like stains on them and were processed for DNA: one pair of jeans collected from the house, which contained a wallet with a driver's license and Social Security card in defendant's name; the gray sweatpants defendant was wearing when arrested; and one of the shoes defendant was wearing when arrested. The profiles obtained from two stains at the knee and lower leg of the jeans and two exterior stains on the shoe belonged to a single female contributor with the same DNA profile as E.M. That profile would be "expected to occur in a randomly selected unrelated

8.

individual in approximately 1 in 5.5 nonillion African Americans, 1 in 33 octillion Caucasians, and 1 in 4.5 octillion Hispanics."[5] Defendant was eliminated as a source of the profile.

The profile from the lower leg of the gray sweatpants belonged to at least two contributors whose profiles were consistent with defendant's and E.M.'s profiles, and there was no DNA present that was foreign to their combined profiles. Defendant was assumed to be one contributor because he was wearing the sweatpants, and the profile consistent with E.M.'s would be "expected to occur in a randomly selected unrelated individual in approximately 1 in 26 septillion African Americans, 1 in 300 sextillion Caucasians, and 1 in 55 sextillion Hispanics."

### 8. Stipulations

The parties stipulated that the four police body camera footage excerpts were the relevant portions of video from Baroni's body camera on April 5, 2019. The parties also stipulated that defendant suffered three prior felony convictions for corporal injury to a spouse or person with whom he had a dating relationship, in violation of section 273.5. (Evid. Code, § 1109.) The convictions occurred in 2012, 2015 and 2016, and the 2016 conviction included personal infliction of GBI under section 12022.7, subdivision (e).

### B. 2022 Crimes Against A.B. and B.R.

### 1. A.B.'s Testimony

On the evening of September 3, 2022, A.B. went out to dinner with her friends B.R. and R.C. to celebrate her birthday. She had been friends with defendant when she was a teenager, some two decades before, and they reconnected and began seeing each other in 2022 after he reached out via Snapchat.[6] That night, the two were not on

---

[5] The criminalist testified that "a nonillion is essentially a trillion times a trillion times a trillion," and the numbers proceed in descending order from nonillion to octillion to septillion.

[6] The parties stipulated that defendant and A.B. were in an intimate relationship that met the requirements of section 273.5.

speaking terms and A.B. considered them broken up following an argument they had a day or two earlier.

Prior to going to dinner, A.B. posted a video of herself on Snapchat with R.C. at B.R.'s apartment. Defendant could see the video and he had been to B.R.'s apartment, which was visible in the video, several times before. He messaged A.B. through the app and told her that she looked beautiful or pretty and wished her a happy birthday.

While at dinner, A.B. posted two or three more videos on Snapchat. Defendant began calling her phone continuously while she was at dinner and leaving her messages telling her to answer her phone, which she ignored. A.B. had one or two beers over dinner, but testified she was not intoxicated.

After dinner, the three walked to the club next door and stayed for a few hours. A.B. had another beer at the club. Defendant continued calling her phone. At some point that evening, he sent her a message on Snapchat telling her he had better not catch her with someone else, which caused her to fear he would find her.

After leaving the club, the three went to a third location to get something to eat and then went back to B.R.'s apartment, which was in a four-plex with one driveway. The three talked outside for a short while before B.R. went inside, and A.B. and R.C. each drove off in opposite directions.

It was dark in the cul-de-sac where A.B. had parked and, as she drove off, she saw headlights and heard screeching as a vehicle pulled up behind her and rammed the back of her car. She recognized the vehicle as defendant's and after he hit her car, she pulled to the side. Defendant pulled up next to the driver's side of her car and she saw he had a front passenger in the car, reclining back. She had seen the passenger, a Hispanic male probably in his late 30's, before but she did not remember his name and did not know him. She and defendant both had their car windows down, and he was yelling and calling her names. He called her "a fucking bitch," told her he was going to catch her, and yelled, "I'll fucking kill you." A.B. took off fast with defendant following behind her.

10.

A.B. was unable to lose defendant, and he rammed her car five or six times as she tried to escape. At one point, she turned down a side street and parked with her headlights off. He drove past the street, but when she turned her headlights back on, he started following her again. At a red light, she was forced to stop. Defendant was yelling out the window at her, so she said, "okay, I will talk to you." Defendant got out of his car, punched her in the mouth through her open window, and said, "bitch, I'll kill you."

A.B. drove off and called B.R., screaming and crying. She told B.R. that defendant was chasing her, and B.R. told her to drive back to the apartment and stay on the phone. It took A.B. about five minutes to get back to B.R.'s apartment and defendant continued to follow her. Throughout the incident, defendant struck her vehicle six or seven times, approximately.

She pulled up in front of B.R.'s apartment, put her car in park, opened the door, and got out, hoping to make it inside the apartment. As soon as she stood up, however, defendant walked up and punched her in the face. She fell back, dazed and bleeding. Everything was blurry, but defendant was yelling and cussing at her. As B.R. was coming out of her apartment, A.B. made her way to the front door. She was telling defendant to go, and B.R. told him, "you're not going to do this here." Defendant said something like "bitch, shut up" or "shut the fuck up," and hit B.R. in the face with his closed fist. As A.B. was screaming, crying, and telling him to leave, defendant hit B.R. three or four times in the face. After the final blow, B.R. blacked out and fell.

As A.B. tried to help B.R., defendant continued to scream and curse. At some point, R.C. showed up and A.B. saw the passenger get out of defendant's car, she thought to get defendant to leave. Defendant then got back in his car and drove off. Police responded, and both A.B. and B.R. were transported to the hospital by ambulance.

A.B. testified that she was left with lasting injuries. She stated her lip was completely numb from the injuries, she was unable to feel the right side of her face, and she had a scar at the corner of her mouth where her lips met. She also testified that she

11.

never repaired the damage to her car, but the estimate she obtained was approximately $2,000. In addition, she said that she did not know defendant was married until the prior court hearing, and that she did not know and had never spoken to anyone named E.M.

### 2. B.R.'s Testimony

B.R. had met defendant several times through A.B., but she never hung out with him and did not know him well. That night, A.B. and R.C. met B.R. at her apartment, and the three went to dinner in A.B.'s car. R.C. drove. B.R. did not feel well and did not eat or drink anything other than water at the restaurant.

After dinner, the three went to a club in the same area as the restaurant. B.R. had one or two beers there. Several hours later, R.C. drove the group to Club One, where they ate. B.R. had one beer. The group then went back to B.R.'s apartment and talked outside for a few minutes. B.R. then went inside, and A.B. and R.C. left in their cars.

B.R. had just put her things down and used the bathroom when she received a call from A.B., who was screaming, "[H]e's going to kill me, he's going to kill me." B.R. asked who and A.B. said, "Daniel." B.R. could tell A.B. was driving and told her to call the police, but she just kept screaming so B.R. told her to drive toward B.R.'s apartment.

B.R. put her shoes on, walked out the door, and locked it. Before she could close her security door behind her, A.B. drove up with another car right behind her. A.B. got out of her car and defendant got out of the driver's side of the other vehicle. A.B. was "kind of bleeding" and was crying. B.R. walked over and stood in front of A.B., who was by her open car door. B.R. told defendant to leave and said, "[Y]ou're not going to do this here." Defendant hit B.R. with his closed fist, dazing her. Things went blurry.

B.R. testified she was hit at least twice, on her eye and on her mouth. She may have been hit more than twice, but there was a gap in her memory between the first hit and the last hit. She remembered that she stumbled after the last hit and that she was in the area of her front door. She testified there was no doubt defendant hit her, but she could only remember some of the details. One punch caused her teeth to "bust[]" through

12.

her lip. She testified she did not lose consciousness, but she was in a daze and everything was a blur after the first hit.

Defendant had a friend with him in the car, and B.R. recalled yelling and commotion, but could not recall what defendant said. She did not see defendant hit A.B. and did not recall how she got from A.B.'s car to her front door area. She saw defendant get back in his vehicle and drive away. At some point, the police arrived, but she said she did not call them.

B.R. testified she was not intoxicated that night and she denied attacking defendant or "jump[ing] him" with her friends. Regarding her injuries, she felt her eye tightening after she was hit and she saw blood. Her tongue was able to pass through her lip and she had a gash on her chin. After she was taken to the hospital by ambulance, she received a total of 10 stitches, approximately, inside and outside her lip and on her chin. She testified she had a scar under her lip, a scar on her chin, and scar tissue in her lip. She also testified she continued to have some loss of feeling in her bottom lip, numbness around the injury on her chin, pain near her left eye, and, for a few months after the incident, sharp head pain that differed from her normal headaches.

### 3. Other Evidence

The parties stipulated to the admission of a 911 call made on September 4, 2022, at 3:19 a.m. by R.C., A.B., and B.R. R.C. stated her friend's ex-boyfriend followed and rammed her friend's car, and he split both of her friends' lips. A.B. provided defendant's name and also said defendant was going to kill her. B.R. and R.C. both requested an ambulance, and R.C. reported one of them had "a busted lip" and the other had "a split lip" that would probably need stitched.

Defendant was arrested October 4, 2022. His vehicle had moderate damage to the front bumper, most significantly on the driver's side. The headlight was broken, and the license plate was damaged. A.B.'s car was red, but the arresting officer did not recall if there was any red paint transfer.

13.

## II.    Defense Evidence

Defendant's aunt, who sat through the trial testimony, testified that in 2022, she met and became friendly with A.B., who was frequently at defendant's house. During a family camping trip in July 2022, defendant's aunt told A.B. defendant was married to E.M., and they had children together. A.B. said she knew and looked embarrassed.

## DISCUSSION

## I.    Admission of E.M.'s Statements

### A.    Procedural Background

Prior to trial, the prosecutor filed a motion in limine seeking to admit two statements E.M. made to Baroni prior to her transport to the hospital, which were recorded on his body camera, and statements she made to McSherry, Pisching, and Spano. The prosecutor argued the statements to Baroni were admissible under Evidence Code section 1240 as spontaneous statements and did not violate the confrontation clause because they were not testimonial within the meaning of *Crawford*. The prosecutor argued the statements to paramedics and hospital medical personnel were admissible under Evidence Code sections 1240 and 1370 to explain the infliction of physical injury should the court find E.M. unavailable as a witness, and the statements were not testimonial.

In his written response, defendant sought the exclusion of E.M.'s statements. Citing *Crawford*, defendant argued that admission of the statements violated his Sixth Amendment rights, and he argued that the statements did not meet the requirements for admission under Evidence Code sections 1240 and 1370.

The trial court held hearings under Evidence Code section 402, at which Baroni, McSherry, Pisching, and Spano testified. In E.M.'s first video-recorded statement to Baroni, made just after police responded to S.O.'s 911 call and while she was still sitting in her grandmother's van, Baroni asked her, "Now are we talking about Daniel Molano Jr. or Daniel Molano Sr.?" She responded, "Junior." In her second video-recorded

14.

statement to Baroni, made after officers assisted her into the office of her uncle's business, she said, "I just don't want to make everything worse," "I'm so—I'm too scared— [¶] … [¶] … it'll be worse," and "I[] almost threw up right there."

McSherry testified that E.M. said her boyfriend assaulted her; Pisching testified that E.M. said her husband, Daniel Molano, physically assaulted her; and Spano testified that E.M. reported her domestic partner assaulted her at 3:30 a.m.

After hearing argument, the trial court admitted E.M.'s first statement to Baroni and her statements to McSherry, Pisching, and Spano as statements under Evidence Code section 1370, infliction or threat of physical injury, subject to a finding that E.M. was unavailable as a witness under Evidence Code section 240. The court also admitted E.M.'s statements to Baroni and her statement to McSherry as spontaneous statements under Evidence Code section 1240. Following testimony by an investigator with the Fresno County District Attorney's office, the court found E.M. was unavailable under Evidence Code section 240.

Although defendant objected to the admission of E.M.'s statements on confrontation clause grounds in his written response to the prosecutor's motion, he did not raise the issue during the hearing and it was not expressly addressed by the trial court. Prior to sentencing, defendant retained new counsel, who filed a motion for a new trial. Among other arguments, defendant contended that E.M.'s statements were inadmissible hearsay; because the statements were testimonial, their admission violated the confrontation clause; and his former counsel's failure to argue the confrontation clause issue and cite relevant legal authority during the motions in limine hearing constituted IAC. The trial court denied the motion and, with respect to the confrontation clause, stated it found E.M.'s statements were not testimonial.

On appeal, defendant challenges the trial court's admission of E.M.'s statements under Evidence Code sections 1370 and 1240, including the finding she was unavailable as a witness, and he claims that the admission of E.M.'s statements to Baroni and

Pisching violated the confrontation clause. Separately, he argues his former counsel's failure to argue that admission violated the confrontation clause constituted IAC.

We turn first to whether the trial court erred in admitting E.M.'s statements under state law (*People v. Blacksher* (2011) 52 Cal.4th 769, 810 & fn. 26 (*Blacksher*)) and, for the reasons that follow, we find no reversible errors in the admission of E.M.'s statements. Although defendant failed to preserve his confrontation clause claim for review because he did not develop any argument against admissibility on that ground prior to or during trial (*People v. Partida* (2005) 37 Cal.4th 438, 434–435 (*Partida*)), we exercise our discretion to consider the claim notwithstanding forfeiture (*People v. McCullough* (2013) 56 Cal.4th 589, 593 (*McCullough*)). Assuming E.M.'s statements to Baroni and Pisching constituted testimonial hearsay and should have been excluded under the confrontation clause, any error was harmless beyond a reasonable doubt given E.M.'s statements to McSherry and Spano identifying her romantic partner as the perpetrator of her injuries and the strength of the physical evidence. These conclusions render defendant's related IAC claim moot and we do not reach it.

**B.     Admission Under Exceptions to Hearsay Rule**

**1.     Legal Principles**

**a.     Infliction or Threat of Physical Injury**

"Hearsay is an out-of-court statement that is offered for the truth of the matter asserted, and is generally inadmissible." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108, citing Evid. Code, § 1200; accord, *People v. Sanchez* (2016) 63 Cal.4th 665, 674 (*Sanchez*).) There are exceptions, including Evidence Code section 1370, which provides, in relevant part:

> "(a)     Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met:
>
> "(1)     The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.

"(2)     The declarant is unavailable as a witness pursuant to [Evidence Code] Section 240.

"(3)     The statement was made at or near the time of the infliction or threat of physical injury.  Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section.

"(4)     The statement was made under circumstances that would indicate its trustworthiness.

"(5)     The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official.

"(b)     For purposes of paragraph (4) of subdivision (a), circumstances relevant to the issue of trustworthiness include, but are not limited to, the following:

"(1)     Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested.

"(2)     Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive.

"(3)     Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section."  (Evid. Code, § 1370, subds. (a), (b).)

At issue in this case, a declarant is unavailable as a witness under Evidence Code section 240 if he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."  (*Id.*, subd. (a)(5).)

b.     **Spontaneous Statements**

To qualify for admission as a spontaneous statement under Evidence Code section 1240, """(1) [t]here must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers

17.

to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." [Citations.]' [Citation.] A statement meeting these requirements is 'considered trustworthy, and admissible at trial despite its hearsay character, because "in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief." [Citation.]' [Citation.]

"A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was 'time to contrive and misrepresent.' [Citation.] Such factors include the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication." (*People v. Merriman* (2014) 60 Cal.4th 1, 64 (*Merriman*); accord, *Blacksher, supra*, 52 Cal.4th at p. 817.) "[T]hese factors 'may be important, but solely as an indicator of the mental state of the declarant,'" and "no one factor or combination of factors is dispositive." (*Merriman, supra*, at p. 64; accord, *Blacksher, supra*, at p. 817.)

### c.     Standard of Review

"[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception (*People v. Martinez* (2000) 22 Cal.4th 106, 120) and '[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto[.]' (Evid. Code, § 402, subd. (c).) We review the trial court's conclusions regarding foundational facts for substantial evidence. [Citation.] We review the trial court's ultimate ruling for an abuse of discretion [citations], reversing only if '"the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'" (*People v. DeHoyos*

18.

(2013) 57 Cal.4th 79, 132; accord, *People v. Chhoun* (2021) 11 Cal.5th 1, 47; *People v. Fayed* (2020) 9 Cal.5th 147, 189–190; *Merriman, supra*, 60 Cal.4th at p. 65.)

### 2. Infliction of Injury Exception

Defendant challenges that admission of E.M.'s first statement to Baroni and her statements to McSherry, Pisching, and Spano, admitted under Evidence Code section 1370. He claims her statements were not "made under circumstances that would indicate … trustworthiness" (*id.*, subd. (a)(4)), and that the court erred in finding E.M. unavailable as a witness (*id.*, subd. (a)(2)).

### a. Trustworthiness

To be admissible under Evidence Code section 1370, a "statement [must be] made at or near the time of the infliction or threat of physical injury" (*id.*, subd. (a)(3)), and defendant argues that the trial court disregarded the seven- to eight-hour passage of time between the crime and the statements as insignificant, which undermines the statement's trustworthiness (*id.*, subd. (a)(4)). In addition, defendant argues that the court's reliance on other evidence that was going to come in at trial was infirm because the only evidence positively identifying defendant as the perpetrator consisted of other hearsay statements and the physical evidence was circumstantial.

First, defendant's reliance on *Merriman* and *Lynch* for support is misplaced. (*Merriman, supra*, 60 Cal.4th 1; *People v. Lynch* (2010) 50 Cal.4th 693 (*Lynch*), abrogated on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637–638.) Both cases address the passage of time within the context of spontaneous statements made while under the stress of excitement of describing or explaining an event, pursuant to Evidence Code section 1240, discussed in more detail below. (*Merriman, supra*, at p. 69; *Lynch, supra*, at p. 754.) Courts of Appeal have recognized, "Although creating a time restriction, the 'at or near' requirement [under Evidence Code section 1370] is *not* equivalent to the spontaneity requirement of [Evidence Code] section 1240." (*Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 92, italics added, fn. omitted, citing *People v.*

19.

*Pantoja* (2004) 122 Cal.App.4th 1, 11, fn. 4.) In the context of Evidence Code section 1370, "The plain meaning of the phrase 'at or near' denotes a time close to the infliction of the injury—which in most circumstances will be within hours or days, rather than weeks or months." (*People v. Quitiquit* (2007) 155 Cal.App.4th 1, 9.) Here, E.M. reported she was assaulted around 3:30 a.m. and that she was only able to escape later in the morning, at which time the 911 call was placed. We disagree that under these circumstances, the timing undermined the court's finding of trustworthiness (Evid. Code, § 1370, subd. (a)(4)), or that, separately, the timing did not support a finding "[t]he statement was made at or near the time of the infliction or threat of physical injury" (*id.*, subd. (a)(3)).

Second, the record does not support defendant's dismissal of other evidence. Under Evidence Code section 1370, a circumstance relevant to the issue of trustworthiness is "[w]hether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section." (*Id.*, subd. (b)(3).) E.M. was beaten and her severe injuries were readily apparent. Discussed below, we conclude the trial court did not abuse its discretion in admitting E.M.'s statements to Baroni and McSherry as spontaneous under Evidence Code section 1240. When law enforcement officers went to E.M.'s house that morning, they observed a vehicle parked there and when they later effected a traffic stop of that vehicle, defendant was driving. He was wearing sweatpants and shoes that appeared to have blood on them, which was later determined to match E.M.'s DNA profile. At the house, officers observed what appeared to be blood in multiple areas, both inside and outside the house, and they collected a pair of jeans with a wallet containing identification and other cards bearing defendant's name. A DNA profile matching E.M.'s was also obtained from blood on those jeans. This

evidence corroborated E.M.'s identification of defendant as the perpetrator of her injuries, and we find no abuse of discretion in the court's finding of trustworthiness.[7]

Defendant's argument that this case is analogous to *Kons* does not persuade us otherwise. (*People v. Kons* (2003) 108 Cal.App.4th 514 (*Kons*).) In *Kons*, a pre-*Crawford* decision, the victim was shot and gave two statements to police, one immediately after the crime identifying the shooter by a nickname and the other one or two days later identifying the defendant from a lineup. (*Kons, supra*, at p. 517.) The trial court found the victim unavailable and admitted both statements under Evidence Code section 1370. (*Kons, supra*, at p. 518.) The Court of Appeal concluded that while the first statement may well have been admissible under "the firmly rooted 'spontaneous declaration' hearsay exception" (*id.* at p. 523), the second statement, made one or two days later under detailed questioning by police, failed to contain sufficient indicia of trustworthiness within the meaning of the confrontation clause (*id.* at p. 524). Because the second statement was the *only* evidence identifying the defendant as the shooter, the constitutional error was prejudicial. (*Id.* at pp. 525–526.)

We address defendant's confrontation clause claim below, but for the reasons previously discussed, we find no error with the trial court's determination that the statements were made under circumstances indicating trustworthiness. In contrast with *Kons*, the statements at issue in this case were not made a day or more later, they were not made under intense police questioning, and there was other evidence corroborating defendant's involvement in the crime. (Evid. Code, § 1370, subds. (a)(4), (b)(3).)

---

**7**    This evidence was summarized by the prosecutor in her trial brief and motions in limine. (See *People v. Fruits* (2016) 247 Cal.App.4th 188, 208 (*Fruits*) ["In determining whether the trial court abused its discretion, we must focus on what the court was made aware of at the time it ruled on the motion, not on evidence that came out or circumstances that took place during the trial."].)

### b. Unavailability

#### 1. Procedural Background and Legal Principles

Next, defendant claims the trial court erred when it found E.M. was unavailable as a witness. Admission of E.M.'s statements under Evidence Code section 1370 required a finding that she was unavailable as a witness under Evidence Code section 240, which in turn required a showing that she was absent and the prosecutor "exercised reasonable diligence but [was] unable to procure … her attendance by the court's process." (*Id.*, subd. (a)(5).) Relevant to that determination, state law precludes a court from imprisoning or otherwise confining or placing in custody the victim of domestic violence for contempt consisting of refusing to testify concerning that domestic violence crime. (Code Civ. Proc., § 1219, subd. (b).) "We review de novo the trial court's unavailability determination, although we defer to the trial court's determination of historical facts supported by substantial evidence." (*People v. Wilson* (2021) 11 Cal.5th 259, 291.)

"'Trial courts "do not have to take extreme actions before making a finding of unavailability." [Citation.]' [Citation.] Instead, *Smith* requires only that the court take '"reasonable steps to induce the witness to testify unless it is obvious that such steps would be unavailing."'" (*People v. Lawson* (2020) 52 Cal.App.5th 1121, 1130, quoting *People v. Smith* (2003) 30 Cal.4th 581, 624 (*Smith*).) "[A]dditional efforts are not required when '"it is obvious that such steps would be unavailing."'" (*Lawson, supra*, at p. 1130, quoting *Smith, supra*, at p. 624.)

Defendant's claim that the trial court erred in finding E.M. unavailable as a witness is supported by the decision in *Ayala*, which defendant argues is analogous. (*People v. Ayala* (2024) 101 Cal.App.5th 62 (*Ayala*).) In addition, defendant argues that E.M.'s statements to the investigator were inadmissible hearsay and, therefore, the court erred in relying on those statements to conclude that E.M. was avoiding court. If we decline to consider the latter argument because defendant's former counsel did not object to consideration of E.M.'s statements, former counsel rendered IAC.

## 2.     Reasonable Diligence Finding

"Factors that a court should consider in determining whether reasonable diligence has been shown include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored." (*People v. Thomas* (2011) 51 Cal.4th 449, 500.)  In *Ayala*, pursuant to Evidence Code section 1291, the trial court admitted the preliminary hearing testimony of a key prosecution witness who did not appear at trial.  (*Ayala, supra*, 101 Cal.App.5th at pp. 64–65; see *People v. Herrera* (2010) 49 Cal.4th 613, 621 [Evid. Code, § 1291 codifies """"exception to the confrontation requirement where a witness is unavailable and has given testimony at previous judicial proceedings against the same defendant [and] which was subject to cross-examination"""]; accord, *People v. Wilson, supra*, 11 Cal.5th at p. 290.)  The Court of Appeal concluded the trial court erred in finding the witness unavailable because the prosecution did not demonstrate reasonable diligence in securing her presence at trial.  (*Ayala, supra*, at p. 70.)  Given that her testimony was critical to the prosecution's case, the error was not harmless beyond a reasonable doubt.  (*Id.* at pp. 71–72.)

We find *Ayala* readily distinguishable.[8]  The witness in question in that case, Breanna, was homeless but cooperative.  (*Ayala, supra*, 101 Cal.App.5th at p. 70.)  She testified at the preliminary hearing, but it took the prosecutor's office two months to locate her for that hearing and the office thereafter lost track of her.  (*Id.* at p. 67.)  In finding the absence of due diligence, the appellate court stated, "There is nothing in the record to suggest that Breanna disappeared to avoid testifying, would have been uncooperative if located or even knew the prosecution was looking for her." (*Id.* at p. 70.)  "Although the prosecution exercised diligence during the two weeks it searched

---

[8]     Defendant dismisses the distinctions between *Ayala* and this case as "inconsequential." We do not agree.

for Breanna immediately before trial, it did nothing to locate her during the months this matter was repeatedly continued for trial, making the search untimely. The uncertainty as to when trial would begin does not excuse the prosecution from timely starting to search for a cooperative witness *it actually knew was missing*. The record suggests Breanna would have been found and produced had the prosecution begun to look for her even a short time earlier." (*Id.* at pp. 70–71, fn. omitted, italics added.)

In this case, in contrast, the prosecutor's office did not lose track of E.M. and she was not cooperative. The prosecution knew where E.M. lived, and investigators served her in 2020. At that time, E.M. did not say much, but appeared to be cooperative insofar as she stayed and listened. In August 2023, the prosecutor's investigator, Patricia Varela, who testified at the hearing, attempted to serve E.M. with a subpoena. Access to the residence was blocked by padlocked gates, but the investigator could see the front door, which was behind a security screen door, was open. After the investigator yelled out, a woman came to the door. The investigator asked for E.M. and, when asked which E.M., responded the younger E.M.[9] Another woman then appeared behind the security door. After the investigator identified herself and stated she was there to serve a subpoena, the women said she did not want to go to court and to leave the subpoena in a mailbox, which the investigator did.

In September 2023, the investigator returned to the same residence. The front door and security door were both closed, and the gates were padlocked. The investigator parked down the street and waited. E.M. exited the residence and went to the mailbox five or 10 minutes later. The investigator drove to the front of the residence, identified herself and said she was there to serve E.M. with a subpoena. E.M. told her to leave it in the mailbox, which the investigator did. E.M. also told the investigator "that [she] and

---

[9] E.M. and her mother have the same first name.

her children were fine and that she did not want to come to court or would not come to court."

Approximately one week later, after E.M. failed to appear in court, a body attachment was issued. The investigator returned to E.M.'s residence a week later. The doors were closed and the gates were locked. The investigator yelled and honked her vehicle horn, but no one came out. She then called E.M.'s mother, who believed E.M. was there because E.M. was supposed to take a relative somewhere that morning. The investigator also believed E.M. was home because she saw the same two vehicles that were at the residence previously. On cross-examination, the investigator stated she would have attempted to bring E.M. to court physically, had E.M. come outside.

"[W]e 'defer to the trial court's determination of the historical facts of what the prosecution did to locate an absent witness,' [and] 'independently review whether those efforts amount to reasonable diligence sufficient to sustain a finding of unavailability.'" (*People v. Thomas, supra*, 51 Cal.4th at p. 503.) We agree with defendant that E.M. was an important witness, but this case involved strong physical evidence—E.M.'s severe injuries, blood at their shared residence, and DNA evidence on defendant's jeans and the clothes he was wearing when arrested—and, as discussed *post*, evidence that E.M. identified defendant as the perpetrator did not depend entirely on admission under Evidence Code section 1370. Several of E.M.'s statements were properly admitted under Evidence Code section 1240 and, one of those, to McSherry identifying the perpetrator as her boyfriend, was not testimonial hearsay, discussed *post*. In light of this evidence, the prosecution's case did not depend entirely on the admission of E.M.'s statements under Evidence Code section 1370.

Critically, the prosecution knew where E.M. lived, and the investigator had communicated with her. E.M. was not only uncooperative with attempts to serve her prior to trial, but she expressed her unwillingness to testify more than once. E.M. was the victim of domestic violence and, as such, could not be imprisoned, confined, or taken into

25.

custody for contempt. (Code Civ. Proc., § 1219, subd. (b).) These circumstances are readily distinguishable from those in *Ayala*, where the prosecution lost contact with a cooperative witness who was homeless and then spent little time trying to locate her despite being aware both that she was missing and that when she previously testified at the preliminary hearing, it took two months to locate her. (*Ayala, supra*, 101 Cal.App.5th at pp. 67, 70–71.)

While additional efforts could have been undertaken, it is "not required when '"it is obvious that such steps would be unavailing."'" (*People v. Lawson, supra*, 52 Cal.App.5th at p. 1130, quoting *Smith, supra*, 30 Cal.4th at p. 624.) E.M.'s location was known, she was aware of the court proceedings and the prosecution's efforts to secure her attendance, and she was uncooperative and communicated to the investigator that she would not go to court. Under these circumstances, we affirm the trial court's finding that E.M. was unavailable as a witness within the meaning of Evidence Code section 240.

### 3. Hearsay

Turning to defendant's claim of inadmissible hearsay, former counsel did not object to E.M.'s statement, which forfeits the issue. "[A] party cannot argue on appeal that the trial court erred in failing to conduct an analysis it was not asked to conduct." (*Fruits, supra*, 247 Cal.App.4th at p. 208, fn. omitted.) "'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided.'" *(People v. Stowell* (2003) 31 Cal.4th 1107, 1114 (*Stowell*).) However, we will exercise our discretion to address, and reject, the argument given its lack of merit and defendant's related claim of IAC. (*McCullough, supra*, 56 Cal.4th at p. 593.)

The prosecutor bore the burden of demonstrating E.M.'s unavailability as a witness under Evidence Code section 240, which required a showing of reasonable diligence. In this circumstance, the investigator's testimony concerning E.M.'s responses was offered not for the truth of the matter asserted, but to show what was done to secure

26.

her presence at trial. (*Smith, supra*, 30 Cal.4th at p. 611 [information relayed to court by prosecutor "may have been legally incompetent, due to the hearsay rule, to show that [the witness] was actually in Japan. But it sufficed to show that the prosecution made reasonable efforts to locate him and that further efforts to procure his attendance would be futile."]; *People v. Contreras* (1976) 57 Cal.App.3d 816, 820–821 [rejecting the defendant's inadmissible hearsay claim because evidence of conversations between police officer and others during search for witness "possessed a relevance independent of their truth, as facts showing the exercise of diligence"].) Therefore, there was no error in considering the statements and, necessarily, defendant cannot show either that former counsel's failure to object was error or that had former counsel objected, there is a reasonable probability the outcome of the proceeding would have been more favorable to him. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*); *People v. Woodruff* (2018) 5 Cal.5th 697, 736 (*Woodruff*).)

In sum, we find no error in the admission of E.M.'s first statement to Baroni or her statements to McSherry, Pisching, and Spano under Evidence Code section 1370.

### 4. Spontaneous Statements

Next, citing *Merriman* and *Lynch*, defendant also argues that the trial court erred in finding E.M.'s two statements to Baroni and her statement to McSherry admissible under Evidence Code section 1240. (*Merriman, supra*, 60 Cal.4th at p. 69; *Lynch, supra*, 50 Cal.4th at p. 754.) He contends that E.M.'s statements were not spontaneous given that seven or eight hours had passed since the assault, she was answering questions, and she was "long removed from the assault and … was in the presence of family, law enforcement, and medical personnel." Defendant also points out E.M.'s tearfulness and fear could have been the result of her injuries, and he asserts the court did not place much weight on her fear given that it declined to admit her statements to the nurse and the doctor as spontaneous even though her demeanor remained the same at the hospital.

The California Supreme Court has stated "that allowing admission of a statement that was made approximately eight hours after the startling event may be the exception rather than the rule" (*Merriman, supra*, 60 Cal.4th at p. 69, citing *Lynch, supra*, 50 Cal.4th at p. 754), and in *Lynch*, the court found that the trial court abused its discretion admitting statements the victim made one or two hours after being injured, concluding that "collectively[, the circumstances] appear to demonstrate that her mental state while describing the attack was thoughtful and reflective" (*Lynch, supra*, at p. 754). However, it remains that "'[n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance*.'" (*People v. Poggi* (1988) 45 Cal.3d 306, 319; accord, *People v. Clark* (2011) 52 Cal.4th 856, 925 (*Clark*).) In *Banks*, the court concluded the trial court did not abuse its discretion in admitting statements a victim made to a police officer over the course of two hours and explained that in *Lynch*, "the '[m]ost critical[]' reason for our holding was that there was 'no testimony … demonstrat[ing] that … [the victim] was excited or frightened as she spoke, or that her physical condition at the time of her statements precluded deliberation.'" (*People v. Banks* (2014) 59 Cal.4th 1113, 1163–1164, quoting *Lynch, supra*, at p. 754, abrogated in part on another ground by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.) In *Clark*, the court found no error in the admission of the victim's statement to a doctor, which occurred hours later, possibly more than eight. (*Clark, supra*, at p. 926.)

"'"[T]he discretion of the trial court is at its broadest" when it determines whether an utterance was made while the declarant was still in a state of nervous excitement'" (*People v. Mataele* (2022) 13 Cal.5th 372, 411 (*Mataele*)), and "we cannot second-guess the trial court's assessment of the evidence in determining [the victim's] state of mind" (*People v. Liggins* (2020) 53 Cal.App.5th 55, 64 (*Liggins*)). Baroni testified when he first spoke to E.M. for several minutes, she was afraid, reluctant to talk to them, and in

severe pain. He described her as "beaten to a pulp," "afraid to get out of the car," and only "able to get bits and pieces out. It seemed like she was having a hard time talking, having a hard time remembering, and with the injuries, it would be understandable under those circumstances." He also testified that defendant was down the street from where they were speaking, and he had not yet been located. An ambulance arrived approximately eight to 10 minutes after police, and paramedics had contact with E.M. McSherry also testified that E.M. was "very fearful" and "hesitant to talk [to them]."

In addition to the testimony of Baroni and McSherry, the trial court saw Baroni's body camera footage of his conversation with E.M., and the record indicates that during some of footage, E.M. was shaking and crying. Given the severity of E.M.'s injuries and her extreme fear and distress, we conclude the trial court acted within its broad discretion in admitting her statements to Baroni and McSherry under Evidence Code section 1240.[10] Moreover, even if the court erred in admitting the statements as spontaneous, the error was unquestionably harmless. E.M.'s first statement to Baroni and her statement to McSherry were admissible under Evidence Code section 1370, as discussed. (*People v. Sanchez* (2019) 7 Cal.5th 14, 39 ["one ground for admissibility is sufficient"].) E.M.'s second statement to Baroni—limited to "I just don't want to make everything worse" and "I'm so—I'm too scared— [¶] … [¶] … it'll be worse"—was

---

[10] Defendant emphasizes that the trial court found E.M.'s statements to Pisching and Spano were not admissible under Evidence Code section 1240, and characterizes the distinction drawn between statements prior to transport to the hospital and statements at the hospital as "arbitrary," inconsistent, and "perhaps outcome-driven." The statements to Pisching and Spano were made later, after E.M. was transported to the hospital, so the court could have very reasonably determined that those distinctions made a difference. (*Mataele, supra*, 13 Cal.5th at pp. 411, 412; *Liggins, supra*, 53 Cal.App.5th at pp. 63–64.) Regardless, we are not undertaking appellate review of the court's decision to admit or exclude those statements under Evidence Code section 1240. Defendant bears the burden of demonstrating error on appeal and, for obvious reasons, he is not advancing the claim that the court erred in finding those statements inadmissible under Evidence Code section 1240. "'We will not … adjudicate hypothetical claims or render purely advisory opinions.'" (*People v. Miracle* (2018) 6 Cal.5th 318, 337, quoting *People v. Chadd* (1981) 28 Cal.3d 739, 746.)

admitted only on the ground that it was a spontaneous statement, but there is no reasonable probability that defendant would have obtained a more favorable result had that statement been excluded from trial. (*Merriman, supra*, 60 Cal.4th at p. 69.)

### C. Confrontation Clause Claim

#### 1. Forfeiture

Defendant also challenges the admission of E.M.'s statements to Baroni and Pisching on the ground it violated the confrontation clause of the Sixth Amendment. As previously set forth, defendant's former counsel objected to the admission of E.M.'s statements on confrontation clause grounds in his written response to the prosecution's trial brief and motions in limine, but he did not argue the issue at the hearing. As a result, there was no discussion concerning which statements were or were not testimonial. After a substitution of counsel, the issue was raised, unsuccessfully, in a motion for a new trial, along with related IAC claims.

"The forfeiture doctrine is a 'well-established procedural principle that, with certain exceptions, an appellate court will not consider claims of error that could have been—but were not—raised in the trial court. [Citation.]' [Citations.] Strong policy reasons support this rule[, because, as previously stated,] '[i]t is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily corrected or avoided. [Citations.]' [Citation.] """"The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal."""""" (*Stowell, supra*, 31 Cal.4th at p. 1114.)

During the motions in limine hearing, defendant failed to object to E.M.'s statements on confrontation clause grounds (Evid. Code, § 353, subd. (a); *People v. Redd* (2010) 48 Cal.4th 691, 729), and the argument that her statements were testimonial is not

a mere constitutional gloss (*Redd, supra*, at pp. 730–731, fn. 19).  Moreover, the "filing of a motion for new trial d[oes] not revive … claims that had not been preserved by a timely and specific objection" (*People v. Cowan* (2010) 50 Cal.4th 401, 486; accord, *People v. Memory* (2010) 182 Cal.App.4th 835, 856, fn. 6), and "a defendant cannot automatically transform a forfeited claim into a cognizable one merely by asserting [IAC]" (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14).

Defendant asserts that the issue was sufficiently raised in his written response to the prosecutor's motions in limine, but we disagree.  The requirement that a party object "must be interpreted reasonably, not formalistically.  'Evidence Code section 353 does not exalt form over substance.'  [Citation.]  The statute does not require any particular form of objection.  Rather, 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.'  [Citation.]  What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*Partida, supra*, 37 Cal.4th at pp. 434–435; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 366–367.)  Merely asserting an objection to the statements as inadmissible hearsay in violation of the Sixth Amendment in accordance with *Crawford*, without developing any specific argument under the confrontation clause, advancing any argument at all during the hearing, or objecting during trial, is insufficient to alert the prosecution and the trial court to the arguments now advanced on appeal.

Nevertheless, as previously stated, we have the discretion to consider defendant's claim on the merits and we will do so, which renders his related IAC claim moot.[11] (*McCullough, supra*, 56 Cal.4th at p. 593.)

### 2. Legal Principles

"'*Crawford* held that, in general, admission of "testimonial" statements of a witness who was not subject to cross-examination at trial violates a defendant's Sixth Amendment right of confrontation, unless the witness is unavailable and the defendant had a prior opportunity for cross-examination.'" (*People v. Barrett* (2025) 17 Cal.5th 897, 1021, quoting *People v. Rangel* (2016) 62 Cal.4th 1192, 1214.) "'Throughout its evolution of the *Crawford* doctrine, the high court has offered various formulations of what makes a statement testimonial but has yet to provide a definition of that term of art upon which a majority of justices agree.' (*People v. Sanchez* (2016) 63 Cal.4th 665, 687.) Nevertheless, 'we have discerned two requirements. First, "the out-of-court statement must have been made with some degree of formality or solemnity." [Citation.] Second, the primary purpose of the statement must "pertain[] in some fashion to a criminal prosecution." [Citations.]' (*People v. Leon* (2015) 61 Cal.4th 569, 603, quoting *People v. Lopez* (2012) 55 Cal.4th 569, 581–582.) More specifically, the primary purpose test asks whether the statements at issue 'are given in the course of an interrogation or other conversation whose "'primary purpose … is to establish or prove past events potentially relevant to later criminal prosecution.'"' (*Rangel, supra*, 62 Cal.4th at p. 1214.) In its most recent application of the primary purpose test, the high court cautioned that '[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers.' (*Ohio v. Clark* (2015)

---

[11] It also moots defendant's undeveloped assertion that the trial court abused its discretion by finding the statements admissible and denying his motion for a new trial, included by defendant as an alternative ground for reaching his confrontation clause claim.

576 U.S. 237, 249; see also *Sanchez, supra*, 63 Cal.4th at p. 694, fn. 19.)" (*People v. Gomez* (2018) 6 Cal.5th 243, 297–298.)

"Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24. [Citation.] 'Since *Chapman*, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' [Citation.] The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?'" (*People v. Geier* (2007) 41 Cal.4th 555, 608.) "'[T]he focus is what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the … verdict actually rendered in this trial was surely unattributable to the error."'" (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

### 3. Any Errors Harmless Beyond a Reasonable Doubt

Defendant challenges E.M.'s statements to Baroni and Pisching as testimonial hearsay admitted in violation of the confrontation clause. The People take the position that E.M.'s statements to Baroni were made during the course of an ongoing emergency, and her statements to Pisching were made during an informal medical examination.

#### a. Statements to Baroni

"[A] statement is not testimonial if an officer is questioning the person in order to address an ongoing emergency—such as finding out whether the perpetrator is still at large, or whether there is a current threat to the public. [Citation.] The key distinction is whether the primary purpose of the questioning is to establish past facts, or to respond to an ongoing emergency. [Citation.] 'The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial.' [Citation.] Whether there is an emergency depends 'on the type and scope of danger

33.

posed to the victim, the police, and the public.'" (*People v. Roberts* (2021) 65 Cal.App.5th 469, 478 (*Roberts*), citing & quoting *Michigan v. Bryant* (2011) 562 U.S. 344, 367, 370, 371 (*Bryant*).) "Simply phrased, 'the proper focus is not on the mere reasonable chance that an out–of–court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial.'" (*People v. Hall* (2024) 107 Cal.App.5th 222, 237, quoting *People v. Cage* (2007) 40 Cal.4th 965, 984 & fn. 14 (*Cage*).)

"Domestic violence cases … often have a narrower zone of potential victims than cases involving threats to public safety. [In the latter situation,] [a]n assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." (*Bryant, supra*, 562 U.S. at p. 363.) Thus, statements made by a domestic violence victim were testimonial hearsay where police responded to a domestic disturbance, found the victim outside alone while her husband was inside, and had the victim fill out an affidavit. There was no emergency in progress, no immediate threat to the victim, and the officer "was not seeking to determine … 'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done." (*Davis v. Washington* (2006) 547 U.S. 813, 830 (*Davis*); accord, *Roberts, supra*, 65 Cal.App.5th at p. 478 [the victim's statements to officer responding to domestic violence call, made from the safety of the hotel manager's office with no one else present and no indication of present threat to the victim or public, were testimonial]; see *People v. Kerley* (2018) 23 Cal.App.5th 513, 551–552 (*Kerley*) [domestic violence victim's statements to officer at the police station after she was removed from the scene were testimonial].)

In contrast, a domestic violence victim's statements to a 911 operator were not testimonial where she called *during* the physical dispute. (*Davis, supra*, 547 U.S. at pp. 817, 829.) When police arrived minutes later, she was visibly shaken up, injured, and acting frantically. (*Id.* at p. 818.) During the call, the victim "was speaking about events *as they were actually happening*, rather than 'describ[ing] past events'" (*id.* at p. 827), and "the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn … what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon" (*ibid.*). Further, her "frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Ibid.*; see *People v. Hall, supra*, 107 Cal.App.5th at pp. 229–230 & 239 [children's statements to police officers, who responded to a 911 emergency call, found the two children injured and emotional with their father (the defendant) "increasingly recalcitrant," were not testimonial]; *Kerley, supra*, 23 Cal.App.5th at p. 551 [the victim's statements made to officers, who arrived during "an ongoing, unresolved, and dangerous emergency situation," as they were pulling her out a window they broke to reach her not testimonial].)

E.M.'s first statement to Baroni, indicating defendant was the perpetrator by name, occurred after he arrived at the business in response to a 911 call about a domestic disturbance. He spoke with E.M. for approximately three minutes, she was still sitting in her grandmother's vehicle, and paramedics had not yet arrived. He testified, "Her demeanor was she was afraid. She was reluctant to talk to us. She had a towel covering her face. She was in pain, in severe pain." "During that contact, I mean, she was beaten to a pulp. She was afraid to get out of the car. And ultimately in [domestic violence] situations, the victims are afraid to talk to the police in fear of getting assaulted further." Baroni did not know if a weapon was involved, he did not know where the suspect was,

and he was trying to find out what happened. In response to the prosecutor's questions, he answered affirmatively that he was attempting to obtain information for public safety. The second statement to Baroni occurred after E.M. went inside the business.

E.M. was unquestionably injured severely, but she was sitting in a vehicle at a business. The incident was not still in progress, and she was not presently in danger of harm by defendant. Baroni's testimony demonstrates he was questioning E.M. in an attempt to figure out what *happened* in the context of a past incident as opposed to what was *happening* in the context of an ongoing emergency, and he did not testify to any specific facts that indicated a present threat to public safety. This suggests E.M.'s first statement, and by necessity her second statement inside the business's office, were testimonial. (*Davis, supra*, 547 U.S. at pp. 829–830; *Roberts, supra*, 65 Cal.App.5th at p. 478; *Kerley, supra*, 23 Cal.App.5th at pp. 551–552.) However, as discussed below, we need not decide whether the statements were admitted in violation of the confrontation clause because assuming so, the error is harmless.

### b.    Statement to Pisching

With respect to statements to medical personnel, in *Cage*, the California Supreme Court concluded that the victim's response to a doctor's neutral question, asked solely "to determine, in accordance with [the doctor's] standard medical procedure, the exact nature of the wound, and thus the correct mode of treatment" was not testimonial. (*Cage, supra*, 40 Cal.4th at p. 986.) The court explained, "Objectively viewed, the primary purpose of the question, and the answer, was not to establish or prove past facts for possible criminal use, but to help [the doctor] deal with the immediate medical situation [the victim] faced." (*Ibid.*)

In contrast, the court in *Vargas* concluded that the victim's statement to the nurse conducting a sexual assault examination was testimonial. (*People v. Vargas* (2009) 178 Cal.App.4th 647, 654.) "[I]n examining and questioning [the victim] for the purpose of collecting evidence to be used by the police in investigating the sexual assault and in

36.

possibly prosecuting the offender, [the nurse] acted as an agent of law enforcement." (*Id.* at p. 660.) "[She] questioned [the victim] according to a rigorous, statutorily mandated format designed to have [the victim] describe the specific sexual acts which she was forced to perform. Thus, like testimony, the interview was intended to make a record of past facts, and it certainly possessed at least 'some degree' of 'the formality and solemnity characteristic of testimony.'" (*Id.* at p. 661.) "'"[O]bjectively … " considering all the circumstances that might reasonably bear on the intent of the participants in the conversation,' it is clear that the primary purpose of the examination was 'to establish or prove some past fact for possible use in a criminal trial.'" (*Ibid.*) The nurse's "'clear purpose … was not to deal with a *present emergency*, but to obtain a fresh account of *past events involving* [*the*] *defendant* as part of an inquiry into possible criminal activity.'" (*Id.* at p. 662.)

"[M]ere status as a mandated reported d[oes] not render [a] statement … testimonial." (*Cage, supra*, 40 Cal.4th at p. 988.) However, Pisching testified at the evidentiary hearing that because she was a mandated reporter and aware the incident was possibly a case of domestic violence, she asked E.M., "What happened, who did it[?]" Pisching stated her questions were *not* necessary to E.M.'s medical care, and although the police were not yet present, they had been called. Certainly, the interaction between Pisching and E.M. differed from the detailed sexual assault exam conducted by the nurse in *Vargas*, but neither was Pisching's question merely a passing one asked solely to assist in medically treating E.M., as in *Cage*.

However, as with E.M.'s statements to Baroni, we need not decide whether her statement to Pisching was testimonial because even if we assume her statements to both Baroni and Pisching were admitted in violation of the confrontation clause, the error was harmless.

37.

### c. No Prejudice

Unquestionably, the prosecutor bore the burden of proving all of the elements of the offenses beyond a reasonable doubt (see *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822 ["[a] plea of 'not guilty' 'place[s] all material issues in dispute'"]), but the identity of the perpetrator was not a central issue of dispute at trial (see e.g., *People v. Rogers* (2006) 39 Cal.4th 826, 835, 852 [identity of murderer a material issue where the defendant connected to murders of two women engaged in prostitution by an eyewitness]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1110–1111, 1121 [identity a central issue where young women found murdered in their hotel room]; *People v. Schmeck* (2005) 37 Cal.4th 240, 247–248, 286 [identity primary issue at trial where the victim found shot to death after meeting prospective buyer for motor home and the defendant later tried to sell that motor home], abrogated on another ground by *People v. McKinnon, supra*, 52 Cal.4th at pp. 637, 639 & fn. 18; *People v. James* (2011) 202 Cal.App.4th 323, 339 [identity of bank robber only issue at trial]; *People v. Ruiz* (1998) 62 Cal.App.4th 234, 242 [identity primary issue where jury presented with evidence of two possible suspects]). This is a domestic violence case and E.M.'s assailant was not a stranger to her. Given the facts in this case, defendant fails to persuade us that the usage of different descriptors by two witnesses, neither of whom knew E.M. or defendant and both of whom had high volume contact with the public, transformed identity into a central issue. Although defendant argues that outside of E.M.'s statements, the evidence "was highly circumstantial and did not prove identity," circumstantial evidence is not inferior and "'''''may be sufficient to connect a defendant with the crime and to prove his guilt beyond a reasonable doubt.'''''" (*People v. Jones* (2013) 57 Cal.4th 899, 961, quoting *People v. Abilez* (2007) 41 Cal.4th 472, 504.) Further, there was *no* evidence that E.M. was in a romantic relationship with anyone other than defendant. (See *People v. Gutierrez* (2009) 45 Cal.4th 789, 824 (*Gutierrez*) ["'A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of

38.

direct or circumstantial evidence that links the third person to the crime.'"]; accord, *Abilez, supra*, at p. 517; *Kerley, supra*, 23 Cal.App.5th at p. 572.)

Defendant and E.M. were married, had children together and lived together; she was beaten severely; she identified her romantic partner as the perpetrator; blood stains were found inside and outside her house, as was a bloody pair of shorts still damp with what appeared to be urine; a pair of bloody jeans with defendant's identification in them and a DNA profile matching E.M.'s was located inside the house; and defendant was arrested that day wearing sweatpants and shoes with blood stains with a DNA profile matching E.M.'s. Moreover, E.M.'s father, who was a part of her life and to whom she turned when she needed help at that time, did not question whether the perpetrator was someone other than her husband with whom she lived. Further, the parties stipulated that defendant had three prior convictions for domestic violence, from which the jury was entitled to infer his propensity to commit that crime. (*Kerley, supra*, 23 Cal.App.5th at pp. 531–532.)

Defendant places emphasis on the fact that McSherry used the term "boyfriend" and Spano used the term "significant other,"[12] and E.M. did not identify defendant by name to either of them, but, as discussed, under the circumstances in this case, that they did not testify she identified defendant by his name or as her husband did not transform identity into a central issue of dispute. Former counsel argued these issues, but given it was the prosecutor's burden to prove the elements of the crime, his focus was on attacking the evidence generally in an attempt to create reasonable doubt in the minds of the jurors. Third party culpability was not an issue, as defendant did not introduce evidence of a third party romantic partner to E.M. and, therefore, his argument on appeal that E.M.'s description of her attacker as her significant other or boyfriend "could just as

---

[12] Spano used the term domestic partner during the evidentiary hearing and significant other at trial.

likely refer to someone other than [him]" is not supported by evidence in the record. (*Gutierrez, supra*, 45 Cal.4th at p. 824.)

In short, even if the trial court erred in admitting E.M.'s statements to Baroni and Pisching under the confrontation clause, the error was harmless beyond a reasonable doubt given E.M.'s statements to McSherry and Spano identifying the perpetrator in terms that describe one's romantic partner, the evidence that she was married to and living with defendant, and the strength of the physical evidence connecting defendant to the crime. Therefore, we conclude, beyond a reasonable doubt, that any error in admitting the statements to Baroni and Pisching did not taint the jury's decision and the verdict """"was surely unattributable to the error.""" (*People v. Pearson, supra*, 56 Cal.4th at p. 463.)

## II. Substantial Evidence Challenge to Jury's Findings Defendant Inflicted GBI on A.B. and B.R.

### A. Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357). "In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary

finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60; accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

### B.    Analysis

Within the meaning of section 12022.7, "[GBI] 'means a significant or substantial physical injury.' [Citations.] This court has long held that determining whether a victim has suffered physical harm amounting to [GBI] is not a question of law for the court but a factual inquiry to be resolved by the jury. [Citations.] '"A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description."' [Citations.] Where to draw that line is for the jury to decide." (*People v. Cross* (2008) 45 Cal.4th 58, 63–64, fn. omitted, quoting § 12022.7, subd. (f) & *People v. Escobar* (1992) 3 Cal.4th 740, 752 (*Escobar*).)

"Some physical pain or damage, such as '[a]brasions, lacerations, and bruising can constitute [GBI].'" (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 464.) In this case, defendant punched both A.B. and B.R. in the face more than once with his closed fist. A.B. testified the blow defendant delivered in front of B.R.'s apartment dazed her and that defendant knocked B.R. out. Both women sustained injuries to their faces and B.R.'s lip was split open. Both women were also transported to the hospital by ambulance for treatment, B.R. needed stitches and both had scarring. Finally, both women also testified that at the time of trial, more than one year later, they still had facial numbness from being punched.

Defendant relies on *Taylor*, *Thomas*, and *Cabrera* in support of his argument that A.B. and B.R. did not suffer GBI. (*People v. Taylor* (2004) 118 Cal.App.4th 11 (*Taylor*); *People v. Thomas* (2019) 39 Cal.App.5th 930 (*Thomas*); *In re Cabrera* (2023) 14 Cal.5th 476 (*Cabrera*).) These cases do not support the proposition that, as a matter of law, the injuries suffered by A.B. and B.R. are insufficient to support the jury's GBI findings. In *Taylor*, the victim suffered a small crack in the bone around her eye, there was no eye

41.

damage, and her doctor testified such injuries usually heal without treatment. (*Taylor, supra*, at p. 17.) She also suffered facial swelling, a cigarette burn mark, bite marks, and abrasions and contusions. (*Ibid.*) The jury convicted the defendant of corporal injury on a cohabitant, assault with force likely to produce GBI, and battery with serious bodily injury, but found the attached GBI enhancements not true. (*Id.* at pp. 17–18.)

The trial court imposed prior serious felony conviction enhancements under section 667, subdivision (a)(1), but the appellate court concluded that was error because there was no basis for categorizing the defendant's crimes as serious felonies given the jury's finding he did not personally inflict GBI. (*Taylor, supra*, 118 Cal.App.4th at pp. 19–20.) The court acknowledged that "[a]lthough the terms '[GBI]' and 'serious bodily injury' have been described as being 'essentially equivalent' [citation] or having 'substantially the same meaning' [citations], they have separate and distinct statutory definitions" (*id.* at p. 24), and the record reflected the jury made a "considered decision" (*id.* at p. 25). The court stated, "The jury conscientiously applied the instructions given and decided that the victim's bone fracture did not constitute [GBI] because it was only a 'moderate' injury within the meaning of CALJIC No. 17.20. *This is a factual determination that is reserved for the jury*. [Citation.] In its verdicts, the jury distinguished between [GBI] and serious bodily injury, because only the latter was defined to include a bone fracture, as the prosecutor herself noted in closing argument. Thus, the jury's finding that the bone fracture fell within the definition of serious bodily injury was not equivalent to a finding of [GBI]." (*Ibid.*, fn. omitted, italics added.) The court also stated, "To the extent there is any arguable legal inconsistency in the jury's verdicts, it is primarily a result of the fact that CALJIC No. 9.12 and the closing arguments may have misled the jury by erroneously suggesting that *any* bone fracture constitutes serious bodily injury, no matter how minor." (*Ibid.*, fn. 4.)

*Taylor* did not confront, as we do here, the question whether the evidence of a victim's injuries is sufficient to support a jury's GBI enhancement finding, and the

42.

decision does not stand for the proposition that the injuries in that case were insufficient to constitute GBI as a matter of law. Rather, the court was tasked with determining whether, based on the jury's finding of serious bodily injury and rejection of GBI, the trial court was permitted to treat the defendant's crimes as serious felonies on the ground that serious bodily injury is legally equivalent to GBI. (*Taylor, supra*, 118 Cal.App.4th at pp. 22–23.) In concluding the answer was no in that specific case, the court explained, "It is settled that courts must make every effort to interpret a jury's verdict as being consistent. [Citation.] A jury's findings will be treated as inconsistent only if they are clearly antagonistic and absolutely irreconcilable with each other under any rational view of the evidence. [Citation.] Based on a careful review of the record, we conclude that the jury's findings are not inconsistent with one another. *In the particular circumstances of this case*, the conviction for battery with serious bodily injury is not legally or factually equivalent to a finding of [GBI]." (*Id.* at pp. 23–24, italics added.) *Taylor* does not aid defendant.

In *Thomas*, the victim's jaw was broken, it had to be surgically repaired with screws and plates, and he suffered permanent nerve damage. (*Thomas, supra*, 39 Cal.App.5th at p. 934.) The jury convicted the defendant of battery with serious bodily injury, but found the GBI enhancement allegation not true. (*Id.* at p. 933.) The issue was not whether the evidence would have been sufficient to support a GBI enhancement finding but whether, in light of the jury's finding, the trial court erred when, years later, it found the defendant intended to inflict GBI and was, therefore, ineligible for resentencing under section 1170.12, subdivision (c)(2)(C)(iii). (*Thomas, supra*, at p. 933.)

In *Cabrera*, the victim was knocked unconscious by a punch and left in a pool of blood. (*Cabrera, supra*, 14 Cal.5th at pp. 480–481.) He needed three stitches, his skull was visible through the wound, and he complained of some dizziness and headaches since the injury. (*Id.* at p. 481.) The jury found the defendant committed battery with serious bodily injury, but was unable to reach a verdict on whether he inflicted GBI and a

43.

mistrial was declared as to those allegations. (*Id.* at p. 480.) The trial court found the defendant's convictions qualified as serious felonies under section 667, subdivision (a)(1), and it distinguished *Taylor* on the ground that the jury there found the GBI enhancement not true. (*Cabrera, supra*, at p. 489.) The California Supreme Court found the trial court erred in engaging in judicial factfinding, in contravention of *Apprendi v. New Jersey* (2000) 530 U.S. 466. The court observed that it has "declined invitations in the past to decide whether a particular type of injury amounts to [GBI] as a matter of law" (*Cabrera, supra*, at p. 484), and "[w]hat meets the statutory standard is a factual question for the jury" (*ibid.*). *On the facts of the case, the jury could have found GBI or could have rejected GBI, but it was for the jury to determine.* (*Id.* at p. 488.) However, because the jury did not find GBI, and its finding of serious bodily injury did not necessarily establish GBI, the trial court's GBI finding "violated Cabrera's 'Sixth Amendment right to have essential facts found by a jury beyond a reasonable doubt.'" (*Id.* at p. 489.)

None of these cases supports defendant's claim that the evidence in this case was insufficient, as a matter of law, to support the jury's finding that he personally inflicted GBI on A.B. and B.R. The jury saw photographs of the victims after they were injured, listened to their testimony concerning the injuries at the time and the residual effects, and evaluated their credibility. We are not persuaded that victims who were left bloodied, in pain, dazed (A.B.) or unconscious (B.R.), and with facial injuries to the extent that both still had numbness remaining more than one year after being punched multiple times did not, as a matter of law, suffer GBI. (*People v. Quinonez, supra*, 46 Cal.App.5th at p. 464; see *People v. Jaramillo* (1979) 98 Cal.App.3d 830, 836 [while a close issue, pain, contusions, swelling, and discoloration from being repeatedly hit with a wooden dowel sufficient to support jury's GBI finding].) That is, that no reasonable trier of fact could have found GBI. The jury found otherwise and there is sufficient evidence in the record to support those findings. It is immaterial that ""'the circumstances might [also]

44.

reasonably be reconciled with a contrary finding." ' " (*Escobar, supra*, 3 Cal.4th at p. 750; accord, *People v. Thomas, supra*, 14 Cal.5th at pp. 377–378.) Therefore, we reject defendant's claim that the jury's findings are not supported by substantial evidence.

## III. Right to Testify

### A. Procedural Summary

Toward the end of the prosecution's case-in-chief, the trial court stated on the record that the prosecutor had two witnesses and a 911 call left to present. The court noted that former counsel had indicated defendant had not yet decided whether he was going to testify. The court gave defendant until 1:30 p.m. to decide and stated he would not be required to start his testimony prior to 1:30 p.m.

After the prosecution rested and the court excused the jury with instructions to return at 1:30 p.m., the court told defendant it was time to decide whether he was going to testify. Defendant consulted with former counsel off the record, and former counsel then stated for the record that they had gone back and forth, defendant understood he had the absolute right to testify and the absolute right not to testify, and he understood that if he testified, the prosecutor would get to question him about his prior convictions, which was a primary concern for him. Former counsel also stated defendant had some other concerns specific to him that he could address if he wanted. Defendant then expressed he felt rushed, he wanted to talk to his family and thought he had more time, and he was hesitant to testify because he was in danger and feared for his life. Former counsel added that he understood defendant had been assaulted and defendant believed it was related to E.M. Former counsel stated defendant wanted to run something by his family that he was not able to in a call or in person.

The trial court stated it could not facilitate an unrecorded call, they had been in trial since the previous week, the court had kept track of how many witnesses were left by asking the prosecutor throughout, and defendant had a weekend to consider things. The trial court reiterated it would give him until 1:30 p.m. to decide, and former counsel

made the record that they had previously discussed the issue; it had not just come up that day.

The trial court subsequently advised defendant he had the right to remain silent and the right to testify, and asked if he had enough time to discuss the right with his attorney. Defendant said he was being rushed into it, but conceded he had discussed the matter with former counsel more than once. After questioning defendant, the court asked if he was freely and voluntarily giving up his right to testify and he stated yes. The court found defendant expressly, knowingly, freely, and voluntarily waived his right to testify, and defendant responded that he was not freely waiving the right and was doing it out of fear. The court then explained that he was making the decision freely by weighing the factors, but he could still take the witness stand.

Defendant now claims that under these circumstances, his waiver of his right to testify was not free and voluntary, the trial court abused its discretion in finding otherwise, and he was deprived of his constitutional right to testify, resulting in prejudice. We disagree.

### B.    Legal Principles

"A criminal defendant has the right to testify at trial, 'a right that is the mirror image of the privilege against compelled self-incrimination and accordingly is of equal dignity.' (*People v. Barnum* (2003) 29 Cal.4th 1210, 1223; see *People v. Nakahara* (2003) 30 Cal.4th 705, 717.) 'The defendant may exercise the right to testify over the objection of, and contrary to the advice of, defense counsel.'" (*People v. Duong* (2020) 10 Cal.5th 36, 55, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1332 (*Bradford*).) "Absent an express conflict, "'a trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising his Fifth Amendment privilege against self-incrimination and is abiding by his counsel's trial strategy ….""" (*Duong*, *supra*, at p. 55, quoting *People v. Bradford* (1997) 14 Cal.4th 1005, 1053.) Thus, "A trial court has no duty to give such advice or seek an explicit waiver, unless a

46.

conflict with counsel comes to its attention." (*People v. Enraca* (2012) 53 Cal.4th 735, 762.)

### C. Analysis

In this case, the record reflects defendant and his former counsel discussed the issues surrounding whether or not he would testify, and he had more than a week to consider his options, including over a weekend. Although defendant articulated feeling torn over the decision, the record belies any claim he was rushed or did not understand the decision he made; and there is no evidence former counsel interfered with his decision or there existed a conflict between the two over his exercise of his right to testify or not. (*Bradford, supra*, 15 Cal.4th at pp. 1332–1333.) The fact that defendant felt torn due to the existence of competing considerations does not render the decision he made infirm; it simply reflects the reality of the stakes involved. (*Id.* at pp. 1332–1333.) Defendant elected not to testify, and there is no support in the record for his claim that his right to testify was infringed upon by the trial court or by former counsel.

## IV. IAC Claims

Defendant claims various failures by former counsel constituted IAC. We have reached and rejected defendant's evidentiary claims. Therefore, his claims that former counsel's failure to object was deficient performance, resulting in prejudice, are moot. However, defendant also claims IAC based on former counsel's failure to investigate potentially exculpatory evidence as requested by defendant; failure to hire an investigator despite being paid funds do so; loss of defendant's cell phone, which allegedly contained pictures and text messages relevant to the defense and to the credibility of a prosecution witness; and general failure to investigate, prepare for trial and put on a defense. Additionally, he claims that former counsel's failure to confront A.B. with her prior inconsistent statements was IAC.

47.

## A.   Legal Standard

To prevail on a constitutional claim of IAC, a defendant "'must satisfy a two-pronged showing:  that counsel's performance was deficient, and that [he] was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'"  (*Woodruff, supra*, 5 Cal.5th at p. 736, quoting *People v. Alexander* (2010) 49 Cal.4th 846, 888; accord, *Strickland, supra*, 466 U.S. at p. 687.)  "'[T]he standard for judging counsel's representation is a most deferential one.'  (*Harrington v. Richter* (2011) 562 U.S. 86, 105 (*Richter*).)  We 'must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.'  (*Bell v. Cone* (2002) 535 U.S. 685, 702.)  'Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.'  (*Richter*, at p. 105.)"  (*In re Long* (2020) 10 Cal.5th 764, 773.)

Therefore, a "defendant's burden [is] 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on [IAC] on direct appeal only if there is affirmative evidence that counsel had ""'no rational tactical purpose'"" for an action or omission."  (*People v. Mickel* (2016) 2 Cal.5th 181, 198, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 437.)  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  (*Strickland, supra*, 466 U.S. at p. 690; accord, *People v. Barrett* (2012) 54 Cal.4th 1081, 1105.)

### B. Analysis

#### 1. Former Counsel's Loss of Evidence and Failure to Investigate, Prepare for Trial or Present a Defense

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; see *People v. Jenkins* (2000) 22 Cal.4th 900, 952–953 [the "'appellate court generally is not the forum in which to develop an additional factual record'"].) Defendant's claim that former counsel lost evidence and failed to investigate, prepare for trial or present a defense unquestionably requires consideration of arguments and evidence that exceed the scope of this appellate record. These claims, therefore, are not properly raised in this direct appeal.[13]

#### 2. Former Counsel's Failure to Impeach A.B. with Inconsistencies in Her Testimony

Next, defendant faults former counsel for failing to impeach A.B. with the following three areas of inconsistency in her testimony. First, during the preliminary

---

**13** This point was made by the People in their respondent's brief and, in reply, defendant argues that these matters are part of the appellate record by virtue of his declaration and copies of texts messages attached to his motion for a new trial. Not so. The trial court did not reach these matters on their merits and instead expressly recognized that "Most of what [defendant] brings up was outside the presence of the Court." "[I]n appropriate circumstances, the trial court should consider a claim of [IAC] in a motion for new trial, because '*justice is expedited* when the issue of counsel's effectiveness can be resolved promptly at the trial level.' [Citation.] But our assumption has been that courts would decide such claims in the context of a motion for new trial when the court's own observation of the trial would supply a basis for the court to act expeditiously on the motion." (*People v. Cornwell* (2005) 37 Cal.4th 50, 101, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; accord, *People v. Carrasco* (2014) 59 Cal.4th 924, 981.) As the trial court impliedly recognized, where, as here, the claim of IAC is found on matters outside of what the trial court observed during trial, the

hearing, she testified only that defendant contacted her through Snapchat; at trial, she also testified defendant called her continuously that night. Second, during the preliminary hearing, she testified defendant threatened to kill her after he first bumped her car, prior to the chase; at trial, she testified he threatened to kill her in the midst of the car chase at an intersection; and, both times, she disclosed the death threat after the prosecutor asked a leading question. Third, during the preliminary hearing, she testified defendant cornered her at an intersection and she had to back up to escape and, at trial, she did not testify about being cornered or having to back up to escape and she testified about trying to speak with defendant voluntarily. He also asserts that A.B. did not remember that defendant stated, "I better not catch you with someone else" until, during the preliminary hearing, her recollection was refreshed by the police report and, during trial, the prosecutor asked a leading question.

"'The failure to impeach a witness or to object to evidence are matters which usually involve tactical decisions on counsel's part and seldom establish a counsel's incompetence.… "'In the heat of a trial, defendant's counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. Except in rare cases an appellate court should not attempt to second-guess trial counsel.…'"'" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1140, quoting *People v. Frierson* (1979) 25 Cal.3d 142, 158.)

We are unpersuaded there was no rational tactical purpose behind the omissions complained of. To the contrary, in each instance, any attempt at impeaching A.B. with what were essentially minor inconsistencies would have risked both emphasizing the facts underlying the charges, which were not favorable to defendant, and potentially alienating the jury by pressing the victim over minor points that occurred during a

claim should be litigated via habeas corpus. (*Cornwell, supra*, at p. 101; *Carrasco, supra*, at p. 981.)

50.

traumatic incident involving physical violence, yelling, threats, and a car chase during which A.B.'s car was rammed a number of times by defendant's vehicle. More specifically, questioning A.B. about her failure to disclose phone calls from defendant during her preliminary hearing testimony risked calling further attention to the matter with no measurable gain given that whether, or how many times, defendant called A.B. that night did not change the circumstances of the subsequent car chase or the physical violence inflicted on A.B. Regarding the threat to kill her, A.B. testified to the threat in both her preliminary hearing testimony and her trial testimony, and she stated twice during the 911 call that defendant was going to kill her, so former counsel could very reasonably have determined that questioning A.B. concerning when the threat was made would not have resulted in any benefit to defendant. As well, focusing on precisely what occurred and when during the car chase would not have changed the fact that A.B. testified to being chased at both the preliminary hearing and trial. We can discern no benefit to defendant in focusing on whether or not she had to back up at some point during the escape.

Finally, the complaint that A.B. did not remember saying defendant told her he had better not catch her with someone else until her recollection was refreshed is meritless. It is unclear what former counsel, in defendant's view, should have done with that information given that A.B.'s recollection was refreshed during the preliminary hearing by her statement in the police report, a statement memorialized closer to the commission of the offenses than, necessarily, either the preliminary hearing or trial. Focusing any further attention on that matter would not have benefitted defendant. Accordingly, we find no error in former counsel's presumably tactical decision not to attempt to impeach A.B. with the inconsistencies described by defendant.

## V. Cumulative Error

Defendant claims cumulative error, which "is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017; accord, *People v. Winbush* (2017) 2 Cal.5th 402, 487; *People v. Hinton* (2006) 37 Cal.4th 839, 897.) "A claim of cumulative error is in essence a due process claim and is often presented as such (see, e.g., *People v. Rogers* (2006) 39 Cal.4th 826, 911). 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial.""'" (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436 (*Rivas*), quoting *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We found no error in the admission of E.M.'s first statement to Baroni and her statements to McSherry, Pisching and Spano under Evidence Code section 1370; and we found no error in the admission of E.M.'s statements to Baroni and McSherry under Evidence Code section 1240, but noted that her first statement to Baroni and her statement to McSherry were independently admissible under Evidence Code section 1370, so even if we assumed her second statement to Baroni was admitted in error, it was harmless under state law. We also found the admission of E.M.'s statements to Baroni and Pisching were harmless beyond a reasonable doubt, assuming they were admitted in error under the confrontation clause; and we rejected defendant's claims that former counsel rendered IAC in failing to impeach A.B. Defendant fails to persuade us of any different outcome if the errors he complains of are viewed in cumulation; he was not deprived of due process and a fundamentally fair trial. (*Rivas, supra*, 214 Cal.App.4th at p. 1436.)

## VI. Sentencing Errors

### A. Section 1385

Section 1385, as amended by Senate Bill No. 81 (2021–2022 Reg. Sess.), effective January 1, 2022, "provides that '[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that

enhancement is prohibited by any initiative statute.'" (*People v. Walker* (2024) 16 Cal.5th 1024, 1032 (*Walker*), quoting § 1385, subd. (c)(1), italics omitted.) "'In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety.'" (*Walker, supra*, at p. 1032, quoting § 1385, subd. (c)(2), italics omitted.) Among the mitigating circumstances are, "Multiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed"; "The application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed"; and "The enhancement is based on a prior conviction that is over five years old." (§ 1385, subd. (c)(2)(B), (C), (H).)

Prior to the sentencing hearing, defendant filed a memorandum arguing for the dismissal of all enhancements because the sentence resulting in the imposition of even one enhancement was over 20 years. In the alternative, defendant argued a single enhancement could be imposed if the trial court dismissed defendant's prior strike conviction. At the sentencing hearing, defendant's counsel requested the trial court exercise its discretion under section 1385 and subsequently argued that the wording of the statute was mandatory, requiring the court to dismiss the enhancements.

Defendant now claims that the trial court abused its discretion when it denied his request to dismiss some of the enhancements under section 1385 without analyzing whether dismissal would endanger public safety and without providing an explanation. He characterizes this omission as the failure to apply the correct legal standard. Relatedly, he claims there is no evidence that dismissal would endanger public safety. He seeks either dismissal of the sentence enhancements on review or remand for resentencing.

53.

As an initial matter, defendant forfeited his claim of sentencing error by failing to object on the grounds now raised on appeal. Requesting dismissal of enhancements under section 1385 and arguing dismissal is mandatory is not sufficient to preserve the claim he raises on review, which is that the court erred because it failed to make an express finding that dismissal would endanger public safety. (*Partida, supra*, 37 Cal.4th at pp. 434–435.) The claim also fails on its merits.

"'[A] court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is' reviewable for abuse of discretion." (*People v. Carmony* (2004) 33 Cal.4th 367, 373.) We presume that a judgment or order of the trial court is correct (*People v. Giordano* (2007) 42 Cal.4th 644, 666), and the moving party bears the burden of demonstrating error on appeal (*People v. Gamache* (2010) 48 Cal.4th 347, 378). As the party challenging the sentence, defendant bears the burden of ""'"clearly show[ing] that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."'"" (*Carmony, supra*, at pp. 376–377, quoting *People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977–978.)

Section 1385 provides, "The reasons for the *dismissal* shall be stated orally on the record." (Italics added.) The statute does not require the reasons for denial be stated on the record (*People v. Brugman* (2021) 62 Cal.App.5th 608, 637), but in selecting the sentence in this case, the trial court did articulate its view in some detail, mentioning defendant's lengthy criminal record; the permanent physical, mental and emotional trauma suffered by the victims; and the aggravating factors to which defendant admitted. Furthermore, approximately four and one-half months after the sentencing hearing, the California Supreme Court issued its decision in *Walker*, resolving a split of authority in the Courts of Appeal and holding that "the plain language of section 1385, subdivision (c)(2) does *not* erect a rebuttable presumption in favor of dismissal that can

54.

only be overcome by a finding that dismissal endangers public safety." (*Walker, supra*, 16 Cal.5th at p. 1033, italics added.) We discern nothing in the trial court's pronouncement of judgment that supports a claim that the court misunderstood the scope of its discretion or otherwise misunderstood the law. (*People v. Salazar* (2023) 15 Cal.5th 416, 425; *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) Therefore, we reject defendant's claim that the court committed reversible sentencing error under section 1385 when it declined to strike any of the enhancements.

### B. GBI Enhancement Attached to Count 7

Finally, defendant claims the trial court erred when it imposed one-third of the upper term for the GBI enhancement attached to his conviction on count 7 for inflicting corporal injury on E.M. He argues that pursuant to section 1170.1, subdivision (a), the court was required to impose one-third of the middle term for the enhancement.[14] The People respond that the trial court had the discretion to select the lower, middle, or upper term for the enhancement and impose one-third of the selected term. Defendant did not respond to this argument in his reply brief.

Section 1170.1, subdivision (a), provides, in relevant part, "The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements. The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses." As the appellate court in *Hill* explained, "Given the clause limiting the trial court's discretion to imposing one-third of the middle term on the subordinate *substantive* offense, the Legislature surely

---

[14] A defendant may challenge an unauthorized sentence on appeal even in the absence of an objection. (*People v. Hernandez* (2024) 103 Cal.App.5th 1111, 1118.)

knew how to limit the trial court's discretion to one-third of the middle term for a subordinate *enhancement*, if that was its intent.  The juxtaposition of the language regarding the subordinate substantive offense and any related enhancement reflects purpose not inadvertence.  By not modifying the word 'term' in the clause relating to the subordinate enhancements, the Legislature made clear what may previously have been implied—that the trial court retains the discretion to use any one of the available terms in calculating the sentence for a subordinate enhancement.  Where only one term may be imposed for the enhancement, the trial court must impose one-third of that term in calculating the sentence for a subordinate enhancement.  [Citation.]  But, when one of three terms is available, the trial court may choose the appropriate term in calculating the sentence enhancement, which includes not only the upper term but also the lower term, if warranted." (*People v. Hill* (2004) 119 Cal.App.4th 85, 91.)

Thus, the trial court did not err in imposing one-third of the five-year upper term for the enhancement.

## DISPOSITION

The judgment is affirmed.

MEEHAN, J.

WE CONCUR:

LEVY, Acting P. J.

DeSANTOS, J.

56.